# TERRITORY OF HAWAII *v.* HARRY M. Y. HO.

## NO. 3078.

ARGUED JANUARY 9, 1957.                    DECIDED JANUARY 31, 1957.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

In this case, information was filed against defendant for offering or exposing for sale imported chicken shell eggs of Australian origin without complying with section 1308.02 of the Revised Laws of Hawaii 1945. The section is a new section added to chapter 20 of the Revised Laws, relating to sale of eggs, by section 5 of Act 167 of the Session Laws of 1955. It provides that it is unlawful for any person to sell, offer or expose for sale any imported chicken shell eggs of foreign origin unless a placard bearing the words "WE SELL FOREIGN EGGS" printed in legible boldface letters of a size not less than three inches

in height is displayed in a conspicuous place where the customers entering can see it.

Act 167 also amended, by section 1 thereof, section 1307 of the Revised Laws, relating to grading standards and regulations. It authorized the board of commissioners of agriculture and forestry to make rules and regulations with respect to sale and transportation for sale of eggs for human consumption; grades or standards of quality and condition; size and weight classes; inspection and classification; assessment and collection of fees for requested certification; labeling of containers of imported and locally produced eggs; character of newspaper advertisements, posters or signs as to size, grade and geographic origin of eggs offered or exposed for sale; seller's invoice for sale of eggs; records of imported shell eggs of foreign origin; and enforcement of the provisions of the subtitle of chapter 20 relating to eggs and the rules and regulations promulgated under the authority of such subtitle.

To the information, defendant filed a demurrer and set forth ten grounds in support thereof. The court below sustained the demurrer on three grounds, namely (a) that Act 167, and in particular section 5 thereof, is in contravention of the fifth and fourteenth amendments to the Constitution of the United States in that it deprives defendant of his property without due process of law by preventing the sale of his property without compliance with its provisions, which provisions are in excess of the lawful exercise of the police power of the Territory; (b) that the Act is void in that section 1 thereof authorizes the board to make rules and regulations without defining any standards therefor; and (c) that the Act is in contravention of clause 2 of Article VI of the Constitution of the United States in that its provisions are in conflict with the express provisions of the General Agreement on Tariffs

and Trade to which the United States and Australia are signatories.

Defendant is charged with violation of section 5 of Act 167, not with violation of any rule or regulation promulgated under section 1. Consequently, we deem it unnecessary to discuss the legality of section 1. We are of the opinion that the demurrer was properly sustained on the ground that section 5 contravenes the General Agreement on Tariffs and Trade.

The General Agreement on Tariffs and Trade is a multilateral agreement originally entered into on October 30, 1947, by twenty-three nations, including the United States and Australia. (61 Stat. Part 5) It was modified by the Geneva Protocol of September 14, 1948. (62 Stat. 3679) It was executed on behalf of the United States by a plenipotentiary of the President. It is not a treaty made by the President by and with the advice and consent of the Senate under Article II, section 2, of the Constitution of the United States. It is an executive agreement made in the exercise of the authority granted to the President "To enter into foreign trade agreements with foreign governments or instrumentalities thereof," under section 350 (a) of the Tariff Act of 1930, as amended. The constitutionality of the grant of such authority has been repeatedly questioned in and out of Congress. Nevertheless, Congress has extended from time to time the period during which the President may exercise such authority. The latest extension is contained in Trade Agreements Extension Act of 1955, which extends the authority until the close of June 30, 1958. In the Act, Congress provided, "That the enactment of the Trade Agreements Extension Act of 1955 shall not be construed to determine or indicate the approval or disapproval by the Congress of the executive agreement known as the General Agreement on Tariffs and Trade."

Article VI, clause 2, of the Constitution of the United

States provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." Under this constitutional provision, there is no question that a treaty made by the President, by and with the advice and consent of the Senate, is the supreme law of the land, overriding all state laws in conflict therewith. This case poses the question: Is an executive agreement, such as the General Agreement on Tariffs and Trade, a treaty within the meaning of this constitutional provision, so that it has the same efficacy as a treaty made by the President by and with the advice and consent of the Senate? We think that it is, under the decisions of the Supreme Court of the United States in *United States* v. *Belmont,* 301 U. S. 324, and *United States* v. *Pink,* 315 U. S. 203. In both cases the court had under its consideration an executive agreement known as the Litvinov Assignment. In *United States* v. *Belmont,* the court stated at page 331: "Plainly, the external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning. * * * And while this rule in respect of treaties is established by the express language of cl. 2, Art. VI, of the Constitution, the same rule would result in the case of all international compacts and agreements from the very fact that complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." In *United States* v. *Pink,* the court stated at page 230, "A treaty is a 'Law of the Land' under the supremacy clause (Art. VI, Cl. 2) of the Constitution. Such international compacts and agreements as the Litvinov Assignment have a similar dignity."

The Territory is *a fortiori* bound by an international agreement having the dignity of a treaty because section

55 of the Organic Act specifically enjoins that its legislative power be exercised consistently with the Constitution and laws of the United States.

Then, in what respects does section 5 of Act 167 contravene the General Agreement on Tariffs and Trade?

The General Agreement on Tariffs and Trade provides in Article III, paragraphs 1 and 4, as follows:

"1. The contracting parties recognize that internal taxes and other internal charges, and laws, regulations and requirements affecting the internal sale, offering for sale, purchase, transportation, distribution or use of products, and internal quantitative regulations requiring the mixture, processing or use of products in specified amounts or proportions, should not be applied to imported or domestic products so as to afford protection to domestic production."

"4. The products of the territory of any contracting party imported into the territory of any other contracting party shall be accorded treatment no less favorable than that accorded to like products of national origin in respect of all laws, regulations and requirements affecting their internal sale, offering for sale, purchase, transportation, distribution or use. The provisions of this paragraph shall not prevent the application of differential internal transportation charges which are based exclusively on the economic operation of the means of transport and not on the nationality of the product."

Certain exceptions to the above quoted provisions are set forth in Article XX of the agreement, as follows:

"Subject to the requirement that such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between countries where the same conditions prevail, or a disguised restriction on international trade, nothing in this Agree-

ment shall be construed to prevent the adoption or enforcement by any contracting party of measures:

I. (a) necessary to protect public morals;

(b) necessary to protect human, animal or plant life or health;

\* \* \* \* \*

(d) necessary to secure compliance with laws or regulations which are not inconsistent with the provisions of this Agreement, including those relating to customs enforcement, the enforcement of monopolies operated under paragraph 4 of Article II and Article XVII, the protection of patents, trade marks and copyrights, and the prevention of deceptive practices."

Section 5 of Act 167, in requiring a conspicuous display of a placard of origin, singles out chicken shell eggs of foreign origin from domestic eggs. No such requirement is imposed in connection with the sale, or offering or exposing for sale, of chicken shell eggs of local or mainland origin. That its purpose is to protect domestic production is indicated by the following statement in Standing Committee Report No. 482 to the President of the Senate, Twenty-Eighth Legislature: "Your Committee conducted a public hearing, at which time it was determined that the majority of poultrymen in the Territory were in favor of this measure." Thus, it contravenes the proscription of Article III, paragraph 1, of the General Agreement on Tariffs and Trade that internal laws affecting the internal sale or offering for sale should not be applied to imported products so as to afford protection to domestic production. Furthermore, in imposing an additional requirement on foreign eggs which is not imposed on domestic eggs, it contravenes Article III, paragraph 4, of the agreement which provides that the products of the territory of any contracting party imported into the territory of any other contract-

ing party shall be accorded treatment no less favorable than that accorded to like products of national origin in respect of all laws affecting their internal sale or offering for sale.

The requirement of section 5 of Act 167 does not come within any of the exceptions in Article XX of the agreement. Such requirement is not necessary for the protection of public morals; nor is it necessary for the protection of human, animal or plant life or health.

If it be deemed that a measure to prevent deceptive practices is necessary, such a measure, more comprehensive and nondiscriminatory, is found in section 1308 of the Revised Laws, which provides: "In the case of eggs imported from the mainland United States or foreign countries, regardless of the person producing the same, each egg so imported shall be marked in clear and plain letters, of not less than twelve point type, the letters 'U. S.', if such egg was produced in the mainland United States, or the name of the country, if such egg was produced in a foreign country, before such eggs may be removed from any dock or landing * * *." The exception under Article XX of a measure relating to the prevention of deceptive practices is subject to the requirement that such a measure is not applied "in a manner which would constitute a means of arbitrary or unjustifiable discrimination between countries where the same conditions prevail, or a disguised restriction on international trade." We think that the additional requirement of a placard of origin only in the case of foreign eggs constitutes a disguised restriction on international trade.

The order sustaining the demurrer, dismissing the indictment and discharging defendant from custody is affirmed.

*Peter Howell,* Assistant Public Prosecutor (also on the brief), for plaintiff in error.

*Robert G. Dodge* (*Heen, Kai, Dodge & Lum* on the brief) for defendant in error.

### CONCURRING OPINION OF STAINBACK, J.

I concur in the conclusion of the foregoing opinion that the territorial law conflicts with the General Agreement on Tariffs and Trade (which is a treaty of the United States) and is, therefore, void. Yet I would like to add that the court below was in error in sustaining the demurrer on the ground that Act 167 is in contravention of the Fifth and Fourteenth Amendments to the Constitution of the United States of America in that it deprives defendant of his property without due process of law.

Ordinarily, for an Act of the legislature to be held unconstitutional it must clearly violate a constitutional provision. All doubt is resolved in favor of the constitutionality of a legislative Act. It does not appear that it is unreasonable for a legislature to pass an Act to protect domestic industry against foreign. Frequently Acts of Congress, particularly tariffs, have provided that goods when imported from a foreign country must have tags indicating their place of origin. Such provisions are to inform the buying public of the fact that the goods are imported so that the buyer, if he feels a home product is of better quality or he wishes to aid home industry, may act accordingly.

It may be asked what is wrong with a requirement to place in a conspicuous spot a placard bearing the words "WE SELL FOREIGN EGGS" printed in legible boldface letters of a size not less than three inches in height, as the placard tells the truth.

While we as a Nation do not, as the Chinese, label all foreigners as "foreign devils," the term "foreign" indicates

some inferiority or undesirable quality in the product. This is not the same as requiring the name of a particular country to be placed upon its product, as such may often be regarded as highly complimentary rather than otherwise. For examples: terms such as "French wines," "English woolens," "New Zealand butter," or "Australian wool," would be beneficial as these products are considered of exceptionally high quality throughout the world, while the term "foreign" standing alone does not so indicate but the contrary is implied when such is required by law. The eggs may be from Timbuktu or anywhere on the globe under such a label. .

As stated above, ordinarily for a law to be unconstitutional it must clearly violate a provision of the Constitution and in construing the same all doubt is resolved in favor of the constitutionality of the Act, but we have a different rule in construing treaties and that is the so-called rule of *uberrima fides*. Where a treaty admits of two constructions, the one giving the most favorable rights is to be preferred. (*Johnson* v. *Brown*, 205 U. S. 309.)

Following this rule, the designation of "foreign eggs" is not as favorable a treatment "in respect of all laws, regulations and requirements affecting their internal sale, offering for sale, purchase, transportation, distribution or use," as is accorded to the sellers of domestic eggs, and therefore the requirement contravenes the General Agreement on Tariffs and Trade.