**NORTH AMERICAN SALT COMPANY, Appellant,**

**v.**

**OHIO DEPARTMENT OF TRANSPORTATION et al., Appellees.**

[Cite as *N. Am. Salt Co. v. Ohio Dept. of Transp.* (1997), 122 Ohio App.3d 213.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE02–225.

Decided Aug. 5, 1997.

*Graydon, Head & Ritchey* and *John B. Pinney*; *Kegler, Brown, Hill & Ritter* and *Stephen E. Chappelear*; *Blackwell, Sanders, Matheny, Weary & Lombardi, L.C.,* 'and *Bruce Campbell,* for appellant.

*Betty D. Montgomery*, Attorney General, *Marc A. Sigal* and *Catherine M. Cola*, Assistant Attorneys General, for appellees Ohio Department of Transportation and Jerry Wray, Director.

*Taft, Stettinius & Hollister* and *Lawrence D. Walker*, for Morton International, Inc.

*Squire, Sanders & Dempsey, Philomena M. Dane* and *Scott C. Lehman*, for Akzo–Nobel Salt Company.

---

BOWMAN, Judge.

Plaintiff-appellant, North American Salt Company ("NAMSCO"), appeals from a judgment of the Franklin County Court of Common Pleas denying its request for injunctive relief against defendant-appellee, Ohio Department of Transportation ("ODOT").

This action arises out of ODOT's refusal to purchase road deicing salt from NAMSCO because the salt is mined in Canada rather than in the United States. The stipulated facts and exhibits indicate that, on August 23, 1996, ODOT issued Invitation to Bid No. 18–97 soliciting bids for road deicing salt for each of Ohio's eighty-eight counties for the 1996–1997 winter. NAMSCO, Morton International, Inc. ("Morton"), and Akzo–Nobel Salt Company ("Akzo") submitted bids in response to Invitation to Bid No. 18–97. With respect to counties located in the southern half of Ohio, the bids of NAMSCO, Morton, and Akzo all called for the salt to be supplied from the companies' respective mines in Louisiana. However, for counties located in the northern half of Ohio, including Wood County, Morton's and Akzo's bids called for the salt to be supplied from the companies' mines in Fairport and Cleveland, Ohio, respectively, while NAMSCO's bid called for the salt to be supplied from NAMSCO's mine in Goderich, Ontario, Canada.

On October 10, 1996, ODOT notified NAMSCO by letter that its bids for Wood County and for several southern Ohio counties had been accepted. NAMSCO's bid for Wood County was more than five percent lower than the lowest bid calling for salt mined in Ohio. By this same letter, ODOT also notified NAMSCO that it was rebidding fifteen northern Ohio counties. Thus, on October 10, 1996, ODOT issued Invitation to Bid No. 18–97A soliciting bids for road deicing salt for fifteen northern Ohio counties for the 1996–1997 winter. The second page of Invitation to Bid No. 18–97A contained the following language in boldface type:

"Buy America Act now recognizes Canadian end source product as a domestic end source product where the purchase is $25,000.00 and above."

NAMSCO, Morton, and Akzo submitted bids in response to Invitation to Bid No. 18–97A. In its bid, NAMSCO again proposed supplying salt for the fifteen

counties at issue from its Goderich, Ontario mine, while Morton and Akzo proposed supplying salt for these counties from their Ohio mines.

Following consultation with the Ohio Attorney General's Office, ODOT notified NAMSCO on November 1, 1996, that it was withdrawing its acceptance of NAMSCO's bid for Wood County because Ohio law required it to select a bidder using salt mined in Ohio where it has received two or more bids proposing the use of the Ohio-mined product.

On November 4, 1996, ODOT opened bids for Invitation to Bid 18–97A. Although NAMSCO's bids for Paulding, Van Wert, Wyandot, Fulton, Sandusky and Williams Counties were more than five percent lower than the lowest bids calling for salt mined in Ohio, ODOT rejected NAMSCO's bids.

On November 6, 1996, NAMSCO filed suit in the Franklin County Court of Common Pleas, requesting a temporary restraining order enjoining ODOT from awarding road salt contracts for Paulding, Van Wert, Wyandot, Fulton, Sandusky, Williams, and Wood Counties, and seeking injunctive relief compelling ODOT to honor its road salt contract with NAMSCO for Wood County, and compelling ODOT to award NAMSCO road salt contracts for Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties in accordance with the terms of Invitation to Bid 18–97A.

On November 8, 1996, NAMSCO filed an amended complaint adding Morton and Akzo as defendants. Following a brief oral hearing, the trial court denied NAMSCO's request for a temporary restraining order. By agreement of the parties, the case was then submitted to the court on briefs, stipulated facts, and exhibits. Following oral argument on December 23, 1996, the court took the matter under advisement. On January 16, 1997, the trial court issued a decision and entry denying NAMSCO's request for injunctive relief and dismissing its complaint. NAMSCO appeals therefrom assigning the following error:

"The trial court erred in denying plaintiff's request that mandatory injunctive relief, or alternatively, declaratory relief, be entered requiring that the Department of Transportation and its Director, Jerry Wray, honor one contract and award six others for the purchase of road salt for the 1996–1997 winter from plaintiff by the Department for seven northwestern Ohio counties."

Preliminarily, Akzo argues that, because the 1996–1997 winter has passed, it is no longer possible to grant NAMSCO the injunctive relief which it seeks and, therefore, NAMSCO's appeal should be dismissed as moot.

We agree that NAMSCO's claim for injunctive relief has been rendered moot by the passage of time; however, NAMSCO argues that its complaint should be read to contain a claim for declaratory judgment. Although NAMSCO has never expressly sought declaratory relief, the last paragraph of its complaint

does request "all additional relief to which [NAMSCO] is entitled at law or in equity." Construing this language to encompass a claim for declaratory judgment results in no unfair prejudice to defendants, as the underlying issues remain the same. Further, the issues of statutory construction raised by NAMSCO's complaint are directly within the scope of the Declaratory Judgment Act. R.C. 2721.03; *Burger Brewing Co. v. Ohio Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 96, 63 O.O.2d 149, 150–151, 296 N.E.2d 261, 263–264. Consequently, this matter will be treated as an appeal from a denial of a request for declaratory judgment.

The pivotal issue in this case is whether Ohio law prohibits ODOT from purchasing road salt mined outside the United States. R.C. Chapter 5513 sets forth the requirements with which ODOT must comply when purchasing machinery, materials, and supplies. Pursuant to R.C. 5513.02(B), R.C. 125.11 is applicable to such purchases by ODOT. R.C. 125.11(B) provides as follows:

"(B) Prior to awarding a contract * * * the state agency responsible for evaluating a contract for the purchase of goods shall evaluate the bids received according to the criteria and procedures established pursuant to divisions (C)(1) and (2) of section 125.09 of the Revised Code for determining if a product is produced or mined in the United States and if a product is produced or mined in Ohio. *The department or other agency shall first remove bids that offer supplies that have not been or that will not be produced or mined in the United States.* From among the remaining bids, the department shall select the lowest responsive and responsible bid, in accordance with section 9.312 of the Revised Code, from among the bids that offer goods that have been produced or mined in Ohio where sufficient competition can be generated within Ohio to ensure that compliance with these requirements will not result in an excessive price for the product or acquiring a disproportionately inferior product. If there are two or more qualified bids that offer goods which have been produced or mined in Ohio, it shall be deemed that there is sufficient competition to prevent an excessive price for the product or the acquiring of a disproportionately inferior product." (Emphasis added.)

The trial court found that R.C. 125.11(B) prohibits ODOT from considering contract bids that offer supplies that will not be produced or mined in the United States. On that basis, the trial court found that ODOT had properly revoked its acceptance of NAMSCO's bid for Wood County, and had properly refused to consider the bids submitted by NAMSCO in response to Invitation to Bid 18–97A.

NAMSCO argues that, in so holding, the trial court failed to read R.C. 125.11(B) in conjunction with R.C. 125.09(C) and the regulations promulgated thereunder. R.C. 125.09(C) provides as follows:

"(C) The director of administrative services shall, by rule adopted pursuant to Chapter 119. of the Revised Code, prescribe criteria and procedures for use by all state agencies in giving preference to United States and Ohio products as required by division (B) of section 125.11 of the Revised Code. The rules shall extend to:

" * * *

"(6) *Criteria and procedures for the director to grant waivers of the requirements of division (B) of section 125.11 of the Revised Code on a contract-by-contract basis where compliance with those requirements would result in the state agency paying an excessive price for the product or acquiring a disproportionately inferior product;*

"(7) Such other requirements or procedures reasonably necessary to implement the system of preferences established pursuant to division (B) of section 125.11 of the Revised Code.

*"In adopting the rules required under this division, the director shall, to the maximum extent possible, conform to the requirements of the federal 'Buy America Act,' 47 Stat. 1520, (1933), 41 U.S.C.A. 10a–10d, as amended, and to the regulations adopted thereunder."* (Emphasis added.)

In accordance with R.C. 125.09(C), the Director of Administrative Services promulgated Ohio Adm.Code 123:5–1–06, which provides as follows:

"(A) Scope. This rule implements the Buy–Ohio Act (Amended House Bill 271, 115th General Assembly) and the policies set forth in the governor's executive order 83–1, January 10, 1983, with respect to supply and service contracts, other than construction contracts. To the extent possible, this rule conforms to the requirements of the Federal Buy America Act, 41 U.S.C.A. 10A–10D, as amended and to the regulations adopted thereunder.

"(B) Policy. *Except as further provided in paragraph (C) of this rule, bids will be evaluated so as to give preference to domestic Ohio bids. This preference shall be applied through the procedures outlined in paragraph (C) of this rule.*

"(C) Procedure for applying domestic Ohio bid preference

"(1) *Bids will first be evaluated to determine that a bidder's offering is for a 'domestic source end product,' as defined at 41 C.F.R. section 1–6.101(D)* [1] *[sic, (d)].* Information furnished by the bidder as provided for in paragraph (D) of this rule shall be relied upon in making the determination. *Any bidder's offering*

---

1. Former Section 1–6.101(d), Title 41, C.F.R., defines a "domestic source end product" as "an unmanufactured end product which has been mined or produced in the United States." By definition, then, any end product which is not a "domestic source end product" is a foreign end product.

*that does not meet this requirement shall be rejected, except in those circumstances where the director of the department of administrative services or his designee determines that certain articles, materials and supplies are not mined, produced or manufactured in the U.S. in sufficient and reasonably available commercial quantities and of a satisfactory quality.*

"(2) Following the determination at paragraph (C)(1) of this rule, remaining bids and proposals shall be evaluated so as to give preference to Ohio bids or bidders who are located in a border state, provided that the border state imposes no greater restrictions than contained in sections 125.09 and 125.11 of the Revised Code (hereinafter in this chapter, it is required that for a bid from a border state, the border state imposes no greater restrictions than are contained in sections 125.09 and 125.11 of the Revised Code). Where the preliminary analysis of bids identifies the apparent low bid as an Ohio bid or a bid from a border state, the director or his designee shall proceed with evaluation and award procedure provided for in rule 123:5–1–07 of the Administrative Code.

"(3) *Where the preliminary analysis identifies the apparent low bid as one other than an Ohio bid or bid from a border state, the director or his designee shall consider the following factors:*

"(a) Whether the goods or services can be procured in-state in sufficient and reasonably available quantities and of a satisfactory quality;

"(b) Whether an Ohio bid has been submitted;

"(c) *Whether the lowest Ohio bid, if any, offers a price to the state deemed to be an excessive price;*

"(d) Whether the lowest Ohio bid, if any, offers a disproportionately inferior product or service.

"*For purposes of applying these criteria, 'excessive price' shall be construed to mean a price that exceeds by more than five per cent the lowest price submitted on a non-Ohio bid.*

"(4) Where the director or his designee determines that selection of the lowest Ohio bid, if any, will not result in an excessive price or a disproportionately inferior product or service, the director or his designee shall propose a contract award to the low Ohio bid at the bid price quoted. The final contract award shall be made following further evaluation and award under rule 123:5–1–07 of the Administrative Code. *Where, otherwise, the director determines it is advantageous to propose the award of contract to other than an Ohio bid or bid from a border state, the director shall propose same.* The final contract award shall be made following further evaluation and award under rule 123:5–1–07 of the Administrative Code. *The director or his designee shall at all times reserve the*

*right to reject all bids, award partial bids and rebid if it is deemed in the best interest of the state to do so."* (Emphasis and footnote added.)

NAMSCO concedes that its bids for Wood, Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties were "non-Ohio bids," as the salt was mined in Canada; however, according to NAMSCO, because its bids for those counties were more than five percent lower than the lowest Ohio bid, ODOT was required to award it the salt contracts for those counties under Ohio Adm.Code 123:5–1–06(C)(4).

NAMSCO contends that R.C. 125.09(C) and Ohio Adm.Code 123:5–1–06(C) provide a state agency with two options where the selection of the lowest Ohio bidder would result in the state paying an "excessive price" (*i.e.*, a price that is more than five per cent greater than the lowest non-Ohio bid) for supplies: either rebid the contract, or award the contract for supplies to an otherwise "responsive and responsible"[2] non-Ohio bidder. Thus, under NAMSCO's reading of these provisions, because ODOT chose to award contracts for Wood County under Invitation to Bid No. 18–97, and for Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties under Invitation to Bid No. 19–97A, rather than choosing to rebid the contracts for those counties when it became aware that it had received bids from NAMSCO for non-Ohio salt which were more than five percent lower than the lowest Ohio supplier's bid, ODOT was legally obligated to award the contracts for those counties to NAMSCO.

■ NAMSCO's reading of Ohio Adm.Code 123:5–1–06(C) is correct except for one critical defect: it fails to recognize the distinction made between bidders offering "domestic source end products" not mined or produced in Ohio and those offering foreign end products. Ohio Adm.Code 123:5–1–06(C)(1) provides that "[b]ids will first be evaluated to determine that a bidder's offering is for a 'domestic source end product,' as defined at 41 C.F.R. section 1–6.101(D). * * * Any bidder's offering that does not meet this requirement [*i.e.*, is a foreign end product] shall be rejected, except in those circumstances where the director of the department of administrative services or his designee determines that certain articles, materials and supplies are not mined, produced or manufactured in the U.S. in sufficient and reasonably available commercial quantities and of a satisfactory quality."

■ Therefore, pursuant to R.C. 125.09(C)(6) and Ohio Adm.Code 123:5–1–06(C)(3)(c) and (C)(4), where an otherwise responsive and responsible non-Ohio bidder submits a bid offering "domestic source end products" which is more than

---

**2.** For the purposes of this discussion, we assume, without deciding, that NAMSCO's bids for Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties were, aside from offering Canadian salt, otherwise "responsive and responsible."

five percent less than the lowest Ohio bid, a state agency, such as ODOT, must either award the contract to the non-Ohio bidder, or rebid the contract.

■ However, pursuant to R.C. 125.11(B) and Ohio Adm.Code 123:5–1–06(C)(1), a bid submitted by a non-Ohio bidder offering nondomestic-source end products will be considered under the five percent "excessive price" exception only where the Director of the Department of Administrative Services has determined that the product in question is "not mined, produced or manufactured in the U.S. in sufficient and reasonably available commercial quantities and of a satisfactory quality."

■ In the present case, the Canadian–mined salt which NAMSCO offered to supply in its bids for Wood, Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties was not a "domestic source end product," as that term is defined in former Section 1–6.101(d), Title 41, C.F.R. Nor is there any evidence in the record that the Director of Administrative Services or his designee has determined that rock salt is "not mined, produced or manufactured in the U.S. in sufficient and reasonably available commercial quantities and of a satisfactory quality." Therefore, ODOT was required to reject NAMSCO's bids for Wood, Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties despite the greater-than-five-percent price advantage offered by NAMSCO.

NAMSCO argues, however, that, because Section 1–6.101(d), Title 41, C.F.R. has been superseded,[3] the definition of "domestic source end product" contained in the replacement regulation rather than the definition in former Section 1–6.101(d), Title 41, C.F.R. should be applied to its bids for Wood, Paulding, Van Wert, Wyandot, Fulton, Sandusky, and Williams Counties. According to NAMSCO, Section 25.402(a)(3)(ii), Title 48, C.F.R. is the regulation which replaced Section 1–6.101(d), Title 41, C.F.R. Section 25.402(a)(3)(ii), Title 48, C.F.R. provides as follows:

"(3) As required by the North American Free Trade Agreement (NAFTA) Implementation Act (Pub. L/ 103–182, 107 Stat.2057), agencies shall evaluate offers of the following NAFTA country end products without regard to the restrictions of the Buy America Act * * *:

" * * * *

"(ii) Canadian end products under supply contracts with an estimated value above $25,000 * * *."

---

**3.** The Federal Procurement Regulation System, Chapters 1–49, Title 41, Subtitle A, C.F.R., of which Section 1–6.101(d), Title 41, C.F.R. was part, was superseded by the Federal Acquisition Regulation System, Chapters 1–49, Title 48, C.F.R., effective April 1, 1984. See "Editorial Note" preceding Chapters 1–49, Title 41, C.F.R.

Relying upon R.C. 125.09(C)(7)'s instruction that "[i]n adopting the rules required under this division, the director shall, to the maximum extent possible, conform to the requirements of the federal 'Buy America Act,' * * * and to the regulations adopted thereunder," NAMSCO argues that Ohio Adm.Code 123:5–1–06(C)(1)'s requirement that bids offering nondomestic-source end products be rejected should be construed in light of Section 25.402(a)(3)(ii), Title 48, C.F.R.'s instruction that "Canadian end products under supply contracts with an estimated value above $25,000" be treated as "domestic source end products." [4]

Assuming, for the moment, that the replacement of Section 1–6.101(d), Title 41, C.F.R. makes it appropriate to look to the replacement regulation for the definition of "Ohio domestic source end product," despite Ohio Adm.Code 123:5–1–06(C)(1)'s express reference to Section 1–6.101(d), Title 41, C.F.R. for the definition of that term, an assertion which is open to serious doubt (see *State v. Gill* [1992], 63 Ohio St.3d 53, 584 N.E.2d 1200), NAMSCO's argument still fails because Section 25.402(a)(3)(ii) is not the regulation which replaced Section 1–6.101, Title 41, C.F.R. Section 25.402(a)(3)(ii), Title 48, C.F.R. is actually a NAFTA implementation regulation contained in Subpart 25.4, Title 48, C.F.R., while former Section 1–6.101, Title 41, C.F.R. is a "Buy America Act," Section 10(a)-(d), Title 41, U.S.Code, implementation regulation.

Further, Section 25.402(a)(3)(ii), Title 48, C.F.R. is inapplicable to purchases by ODOT, as NAFTA does not apply to state government procurements at the current time. See Bohne, NAFTA: What you Need To Know Now (1994) 49. Specifically, NAFTA currently provides in relevant part as follows:

"1 Article 1001: Scope and Coverage

"1. *This Chapter applies to measures adopted or maintained by a Party relating to procurement:*

"(a) *by* a federal government entity set out in Annex 1001.1a–1, a government enterprise set out in Annex 1001.1a–2, or *a state or provincial government entity set out in Annex 1001.1a–3* in accordance with Article 1024:

"(b) *of goods* in accordance with Annex 1001.1b–1 * * *." (Emphasis added.)

Currently, Annex 1001.1a–3 provides as follows:

"Coverage under this Annex will be the subject of consultations with state and provincial governments in accordance with Article 1024 (Further Negotiations)."

---

4. Evidently, ODOT accepted this argument when it awarded NAMSCO the Wood County contract and issued Invitation to Bid No. 18–97A, stating: "Buy America Act now recognizes Canadian end source product as a domestic end source product where the purchase is $25,000.00 and above."

Because Ohio is not currently listed under Annex 1001.1a–3, NAFTA and the federal regulations which implement the treaty, such as Section 25.402(a)(3)(ii), Title 48, C.F.R., do not presently apply to purchases of goods and supplies by the state of Ohio or its governmental agencies.

In fact, Section 25.101, Title 48, C.F.R. is the "Buy America Act" implementation regulation which replaced Section 1–6.101(d), Title 41, C.F.R. See "Editorial Note" preceding Chapter 1–49, Title 41, C.F.R.; Section 25.100, Title 48, C.F.R. Although Section 25.101, Title 48, C.F.R., replaces the term "domestic source end product" defined in Section 1–6.101(d), Title 41, C.F.R., with the term "domestic end product," the definition of this new term is, in relevant part, virtually identical to the definition of "domestic source end product" found in former Section 1–6.101(d), Title 41, C.F.R.[5] Consequently, ODOT was required to reject NAMSCO's bids for Wood, Paulding, Van Wert, Wyandot, Fulton, Sandusky and Williams Counties pursuant to Ohio Adm.Code 123:5–1–06(C)(1) regardless of whether the former or the current federal regulation is used to define the term "domestic source end product." Because there is no substantive difference between former Section 1–6.101, Title 41, C.F.R., and replacement Section 25.101, Title 48, C.F.R., for purposes of this case, we need not reach the issue of which regulation should properly be used to define the term "domestic source end product" for purposes of Ohio Adm.Code 123:5–1–06(C)(1).

Finally, NAMSCO argues that, if R.C. 125.11(B) and Ohio Adm.Code 123:5–1–06(C)(1) do prohibit ODOT from purchasing products which are not mined or produced in the United States, they impermissibly infringe upon the federal government's exclusive authority over foreign affairs.

■■■ It is well settled that the United States Constitution vests the power to formulate and administer foreign affairs exclusively in the federal government. *United States v. Pink* (1942), 315 U.S. 203, 233, 62 S.Ct. 552, 567, 86 L.Ed. 796, 819; *Trojan Technologies, Inc. v. Pennsylvania* (C.A.3, 1990), 916 F.2d 903, 913. As a result, a state law that involves the state in the conduct of foreign affairs is unconstitutional. *Pink.* However, a state law which has only an " 'incidental or indirect effect in foreign countries' " does not unconstitutionally intrude on the federal government's foreign relations power. *Zschernig v. Miller* (1968), 389 U.S. 429, 433, 88 S.Ct. 664, 666–667, 19 L.Ed.2d 683, 688.

---

5. Former Section 1–6.101(d), Title 41, C.F.R. provided " 'Domestic source end product' means an unmanufactured end product which has been mined or produced in the United States," while Section 25.101, Title 48, C.F.R. provides, *"Domestic end product,* as used in this subpart, means (a) an unmanufactured end product mined or produced in the United States." (Emphasis *sic.*)

*Zschernig* marks the only occasion on which the United States Supreme Court has struck down a state statute on the grounds that it infringed on the federal government's authority over foreign affairs. In *Zschernig,* the court struck down an Oregon probate statute that provided that nonresident aliens could inherit from Oregon residents only upon a showing that the alien's country granted reciprocal rights to United States citizens and would not confiscate any property received by inheritance.

In striking the Oregon statute down, the *Zschernig* court observed that the enforcement of such provisions frequently turned on "minute inquiries concerning the actual administration of foreign law" and on foreign policy attitudes connected to the "freezing or thawing of the 'cold war.' " *Id.* 389 U.S. at 435–437, 88 S.Ct. at 668, 19 L.Ed.2d at 689. Applied in such manner, the court concluded that the Oregon statute had a "great potential" of disrupting or embarrassing the United States in its relations with foreign nations and, therefore, constituted more than an incidental or indirect effect on the federal government's power to conduct foreign affairs. *Id.* at 435, 88 S.Ct. at 667–668, 19 L.Ed.2d at 689.

Relying upon *Zschernig,* the Third Circuit, in *Trojan,* recently upheld a Pennsylvania statute prohibiting the use of foreign-made steel in state public works projects against a challenge that it unconstitutionally infringed on the federal government's foreign affairs power. The court held that the Pennsylvania statute, unlike the Oregon statute struck down in *Zschernig,* did not involve the state in the conduct of foreign affairs, as it applied to "steel from any foreign source, without respect to whether the source country might be considered friend or foe." *Trojan,* 916 F.2d at 913. See, also, *K.S.B. Technical Sales Corp. v. North Jersey Dist. Water Supply Comm. of New Jersey* (1977), 75 N.J. 272, 381 A.2d 774, 783–784.

 In the instant case, R.C. 125.11(B) and Ohio Adm.Code 123:5–1–06(C)(1) do not provide Ohio officials with an opportunity to treat foreign nations differently based upon the ideological bent of a nation's government, or based upon any other factor. Rather, the provisions apply equally to all foreign nations. Nor is there any evidence in the record that suggests that these provisions have been selectively applied to goods mined or produced in Canada. As a result, we are unable to find that R.C. 125.11(B) and Ohio Adm.Code 123:5–1–06(C)(1) have any more than an indirect or incidental effect upon the nation's foreign affairs.

Still, NAMSCO relies upon *Bethlehem Steel Corp. v. Bd. of Commrs. of the Dept. of Water & Power of Los Angeles* (1969), 276 Cal.App.2d 221, 80 Cal.Rptr. 800, in support of its argument that R.C. 125.11(B) and Ohio Adm.Code 123:5–1–06(C)(1) unconstitutionally intrude into foreign policy. In *Bethlehem,* the California Court of Appeals struck down a California statute, very similar to the one at issue in the present case. We concede that, under the holding in *Bethlehem,*

Ohio's prohibition on the state's purchase of foreign goods would be unconstitutional; however, we are unpersuaded by *Bethlehem* for two reasons. First, we believe that the United States Court of Appeals' decision in *Trojan* more closely follows the United States Supreme Court's reasoning in *Zschernig.* Second, the *Bethlehem* decision seems to rest, at least in part, upon the court's mistaken belief that the California statute violated several international trade agreements. *Bethlehem,* 80 Cal.Rptr. at 803.

Based upon the foregoing discussion, NAMSCO's sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

TYACK, P.J., and PETREE, J., concur.