K. S. B. TECHNICAL SALES CORP. AND LINDA FAZIO, PLAINTIFFS - RESPONDENTS - CROSS - APPELLANTS, v. NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT-CROSS-RESPONDENT, AND BRISCOE/ COURTER/CONDUIT, A JOINT VENTURE AND TERMINAL CONSTRUCTION CORP., *ET AL.*, INTERVENORS-RESPONDENTS.

Argued October 3, 1977—Decided December 23, 1977.

274

*Mr. Harold R. Teltser* argued the cause for appellant-cross-respondent (*Messrs. Teltser and Perle,* attorneys; *Mr. Teltser,* of counsel and on the brief; *Mr. Michael R. Perle,* on the brief).

*Mr. Michael S. Bokar,* Deputy Attorney General, argued the cause for intervenor-appellant State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

*Mr. Julius B. Poppinga* argued the cause for respondents-cross-appellants (*Messrs. McCarter and English,* attorneys; *Mr. Poppinga,* of counsel; *Mr. John R. Drosdick,* on the brief).

*Mr. Herbert R. Ezor* argued the cause for intervenors-respondents (*Messrs. Heller and Laiks,* attorneys; *Mr. Murray A. Laiks,* of counsel).

The opinion of the court was delivered by

SCHREIBER, J. This case projects for our review the validity of New Jersey "Buy American" statutes, which generally require use in government purchase contracts of materials produced in this country. The bidding specifications of the North Jersey District Water Supply Commission (Commission) for a water treatment plant contained such a provision. K.S.B. Technical Sales Corp. (K.S.B.), a New York corporation which is a wholly owned subsidiary of a West German manufacturer of pumps and pumping equipment, and Linda Fazio, a taxpayer and resident of the City of Clifton, seek an adjudication that the Buy American con-

dition in the specifications be declared invalid and its statutory foundation unconstitutional.

Upon filing a verified complaint, plaintiffs obtained an order to show cause and a temporary restraint preventing the Commission from opening the bids and awarding a contract. The State of New Jersey, Terminal Construction Corporation and Briscoe/Courter/Conduit, a joint venture, were permitted to intervene. Subsequent to the hearing on the return day (the facts are virtually undisputed), the trial court declared the Buy American provision in the specifications invalid, but in view of the pressing need to commence construction permitted the bids to stand. 150 *N. J. Super.* 533 (1977). The plaintiffs K.S.B. and Fazio appealed. The Commission, the State of New Jersey and Terminal cross-appealed. The Appellate Division agreed with the trial court as to the invalidity of the provision, but held that the bids were void. 151 *N. J. Super.* 218 (1977).

The Commission and the State filed appeals and plaintiffs and Terminal cross-appealed. Because of the attendant urgency we accelerated the time for filing briefs' and presenting oral argument. Because of that same urgency we issued an order prior to our opinion. Our order reversed the Appellate Division's judgment that the bids were void and permitted the Commission to proceed with the original bids. This opinion now follows. *Cf. Dolan v. Borough of Tenafly,* 75 *N. J.* 163 (1977).

A brief factual summary is in order. The North Jersey District Water Supply Commission, a governmental agency, was created for the purpose of developing a water supply for municipalities in the northern part of the State. *N. J. S. A.* 58:5-1 *et seq.* It has carried out that function and has been distributing water to eight municipalities in Essex, Hudson and Passaic counties. In 1974 the Commission was ordered to comply with a directive of the State Department of Health to construct a water treatment plant to improve the quality of the water. *State v. North Jersey Dist. Water Supply Comm'n,* 127 *N. J. Super.* 251 (App. Div.), certif. den. 65

N. J. 578, cert. den. 419 U. S. 999, 95 S. Ct. 314, 42 L. Ed. 2d 273 (1974). For that purpose the Commission submitted specifications to prospective bidders which included a requirement that "[o]nly manufactured products of the United States, wherever available, shall be used in the work in accordance with municipalities and counties Local Public Contracts Law. N. J. 40A:11–18." Both the trial court and the Appellate Division held that the applicable statute was N. J. S. A. 52:33–2 and 3, not N. J. S. A. 40A:11–18. 150 N. J. Super. at 545 and 151 N. J. Super. at 223. We agree. Because the New Jersey Legislature has embraced the Buy American concept in almost all facets of governmental operations in substantially the same manner, none of the parties has raised any question in respect of the erroneous statutory citation in the specifications.

State work is governed by N. J. S. A. 52:32–1 which reads as follows:

> The state shall make provisions in the specifications for all contracts for state work and for work for which the state pays any part of the cost, that only such manufactured and farm products of the United States, whenever available, be used in such work. [N. J. S. A. 52:32–1]

This law has remained unchanged since its adoption in 1932.

The recently enacted Local Public Contracts Law (L. 1971, c. 198) which applies to counties, municipalities, and their agencies, as well as to certain types of boards, N. J. S. A. 40A:11–2(1), contains the following:

> Each local unit shall provide, in the specifications for all contracts for county or municipal work or for work for which it will pay any part of the cost, that only manufactured and farm products of the United States, wherever available, be used in such work. [N. J. S. A. 40A:11–18]

Provisions which cover all public works, including, as the trial court and Appellate Division held, projects of the Commission, are N. J. S. A. 52:33–2 and 3. Their terms are:

Notwithstanding any inconsistent provision of any law, and unless the head of the department, or other public officer charged with the duty by law, shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only domestic materials shall be acquired or used for any public work.

This section shall not apply with respect to domestic materials to be used for any public work, if domestic materials of the class or kind to be used are not mined, produced or manufactured, as the case may be, in the United States in commercial quantities and of a satisfactory quality. [*N. J. S. A.* 52:33-2]

Every contract for the construction, alteration or repair of any public work in this state shall contain a provision that in the performance of the work the contractor and all subcontractors shall use only domestic materials in the performance of the work; but if the head of the department or other public officer authorized by law to make the contract shall find that in respect to some particular domestic materials it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular material, and a public record made of the findings which justified the exception. [*N. J. S. A.* 52:33-3]

A contractor's failure to comply with these provisions may disqualify him from being awarded any public work construction contracts for three years. *N. J. S. A.* 52:33-4.

The plaintiffs, who, as counsel stated during oral argument, are not particularly concerned with the award of this contract, seek a general declaration that the New Jersey Buy American statute is unconstitutional. The constitutional issues concern the applicability and effect of the General Agreement on Tariffs and Trade made between the United States and foreign countries, the conflict, if any, between the New Jersey Buy American provisions and the foreign affairs power, and the conflict, if any, between the New Jersey Buy American provisions and the Commerce Clause.

█ Preliminarily we note our concurrence with the trial court's ruling that the plaintiff Linda Fazio, as a taxpayer residing in a municipality which was a contracting municipality of the North Jersey District, has a pecuniary interest in the project. K.S.B. is a potential supplier of pumps. However, K.S.B. was not a bidder and there was no showing that any bidder would have considered pumps sold by K.S.B.

In view of Fazio's clear right to standing, we see no need to pass upon K.S.B.'s status. *See Camden Plaza Parking v. City of Camden,* 16 *N. J.* 150, 158–159 (1954).

## I

## THE NEW JERSEY BUY AMERICAN STATUTE AND THE FEDERAL GENERAL AGREEMENT ON TARIFFS AND TRADE (GATT)

▮▮▮ The General Agreement on Tariffs and Trade (GATT)[1] is a multi-lateral international agreement to which the United States is a party by virtue of executive action. Presidential authority to bind the United States to GATT has been predicated in part on the Reciprocal Trade Agreements Act of 1934 and its successors, 48 *Stat.* 943 (1934) (currently codified at 19 *U. S. C. A.* §§ 1351–1366 (1965 & Supp. 1977)), and in part upon the executive power to conduct foreign affairs.[2] The legal significance of GATT has been considered by all parties as equivalent to that of a treaty. *See United States v. Belmont,* 301 *U. S.* 324, 331, 57 *S. Ct.* 758, 761, 81 *L. Ed.* 1134, 1139–1140 (1937); *United States v. Pink,* 315 *U. S.* 203, 230, 62 *S. Ct.* 552, 565, 86 *L. Ed.* 796, 818 (1942). In the context of this litigation we do likewise. Thus we conclude that GATT is, by virtue of the federal constitution, "the supreme Law of the Land." *See U. S. Const.,* Art. VI, cl. 2.[3] A state law must yield when it

---

[1] The original text of GATT appears at 61 *Stat.,* Pt. 5 (1947).

[2] For background on the Reciprocal Trade Agreements Act, see Note, "The Constitutionality of the Trade Agreements Act," 39 *Colum. L. Rev.* 751 (1939). The legal significance of GATT is analyzed in detail in Jackson, "The General Agreement on Tariffs and Trade in the United States Domestic Law," 66 *Mich. L. Rev.* 249 (1967). *See also* Note, 61 *Colum. L. Rev.* 505 (1961).

[3] The assumption that executive agreements and treaties should have the same legal consequences is by no means compelled. *See*

is inconsistent with or impairs the policy or provisions of a treaty. *Kolovrat v. Oregon,* 366 *U. S.* 187, 190, 81 *S. Ct.* 922, 924, 6 *L. Ed.* 2d 218, 221 (1961); *United States v. Pink, supra.* Thus, whether federal preemption exists in this case depends upon an analysis of GATT, the New Jersey Buy American statute in question, *N. J. S. A.* 52:33-2 and 3, and the status and functions of the Commission.

Facially the Buy American statute, *N. J. S. A.* 52:33-2 and 3, appears to be in direct conflict with GATT, Pt. II, Article III, paragraph 4, 62 *Stat.* 3680 (Vol. 3) (1948), which provides that:

> The products of the territory of any contracting party imported into the territory of any other contracting party shall be accorded treatment no less favourable than that accorded to like products of national origin in respect of all laws, regulations and requirements affecting their internal sale, offering for sale, purchase, transportation, distribution or use.

Both the trial court and the Appellate Division opinions are bottomed on that conclusion. *See also Territory of Hawaii v. Ho,* 41 *Haw.* 565 (Sup. Ct. 1957).

Article III, paragraph 4 of GATT is not, however, all-inclusive. An exception reads as follows:

> The provisions of this Article shall not apply to laws, regulations or requirements governing the procurement by governmental agencies of products purchased for governmental purposes and not with a view to commercial resale or with a view to use in the production of goods for commercial sale. [GATT, Pt. II, Art. III, par. 8(a), 62 *Stat.* 3681 (Vol. 3) (1948)][4]

---

*generally* McDougal and Lans, "Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy," 54 *Yale L. J.* 181 (1945); Mathews, "The Constitutional Power of the President to Conclude International Agreements," 64 *Yale L. J.* 345 (1955).

[4]The agreement also excludes:
[T]he payment of subsidies exclusively to domestic producers, including payments to domestic producers derived from the proceeds of internal taxes or charges applied consistently with the provisions of this article and subsidies effected through governmental purchases of domestic products. [GATT, Pt. II, Art. III, par. 8(b), 62 *Stat.* 3681 (Vol. 3) (1948)]

The Commission has urged that materials to be acquired in connection with the construction of its proposed water treatment plant fall within the exception clause. The exclusionary requisites are: (1) procurement by a governmental agency, (2) of a product, (3) purchased for governmental purposes, (4) not for commercial sale, and (5) not with a view to use in the production of goods for commercial sale. That the Commission is a governmental agency and that it proposes to acquire products, materials with which to construct and equip the plant, are clear.

The plaintiffs contend, however, that the Commission's construction of a water treatment plant is not for a governmental purpose and that the proposed plant will produce "goods", namely water, for commercial sale. Consideration of these contentions necessitates examination of the Commission, its operations and functions.

The North Jersey District Water Supply district was created by the Legislature in 1916 for the purpose of developing water supply sources for the use of any municipality in the eleven most northerly counties in the State. *N. J. S. A.* 58:5–1, *L.* 1916, *c.* 70.[5] Municipalities desirous of "developing, acquiring and operating a water supply or a new or additional water supply for the use of the municipality," were authorized to join together and petition for a commission. *N. J. S. A.* 58:5–2. Upon appointment the commission, to be known as the North Jersey District Water Supply Commission, would become a "body corporate" with power to acquire and use all property necessary for the uses and purposes for which it was created, *N. J. S. A.* 58:5–7, more particularly to provide a sufficient water supply to the contracting municipalities. *N. J. S. A.* 58:5–16. Municipalities were authorized to petition the Commission for a water supply and request an estimate of the cost of such supply, each agreeing to pay its share of the cost. *N. J. S. A.* 58:

[5]A twelfth county was added by *L.* 1919, *c.* 30, § 1.

5–9. Thereupon the Commission was required to hold a public hearing at which other municipalities might signify their willingness to join in the project provided they agreed to pay their share of preliminary expenses. *N. J. S. A.* 58: 5–10 and 11.

Thereafter the Commission was to formulate plans and estimate the costs of acquisition and operation. *N. J. S. A.* 58:5–12. The costs of the construction and acquisition of a water supply were to be borne by the municipalities in proportion to their water contract demands. *N. J. S. A.* 58:5–22. After completion of the plan and commencement of operations, future operating costs and expenses were to be apportioned on the basis of water consumed, but in no case would a municipality pay less than its contract amount. *N. J. S. A.* 58:5–23. Other municipalities in the district could petition the Commission for water, and, if the supply were available, the Commission could agree to furnish water at a price equivalent to an equitable share of the cost of such supply. *N. J. S. A.* 58:5–26.

This statutory scheme was pursued by the seven municipalities which presently comprise the District's contracting members. One municipality, Bayonne, has been a water surplus customer of the Commission.

The Commission initially constructed a dam and reservoir at Wanaque which was placed in service in March 1930. The costs were apportioned among the contracting municipalities. The Commission subsequently developed a Ramapo project which involved diversion from the Ramapo River into the Commission's 21-mile gravity aqueduct system feeding the municipalities. Here again the costs were borne by the contracting municipalities.

The original act under which the Commission was created was supplemented by the water transmission facilities act in 1962. *N. J. S. A.* 58:5–31 *et seq.* That act declares it

to be in the public interest and to be the policy of the State to foster and promote by all reasonable means the prompt, efficient and

economical transmission, treatment, filtration, distribution and use of the water supplies acquired and developed by the State. It is the purpose and object of this act further to implement such policy by, among other things, giving additional powers to certain public corporations heretofore authorized to supply and distribute water, to the end that such public corporations will be enabled to finance, construct and operate facilities necessary for the treatment, filtration, transmission and distribution of water made available by the State to municipalities and persons, pursuant to the provisions of the Water Supply Law. [*N. J. S. A.* 58:5-33]

The Commission is recognized "as an instrumentality exercising public and essential governmental functions and to provide for the public health and welfare." *N. J. S. A.* 58:5-35. The theme of operating at cost is delineated in some detail. Thus the act provides that:

At the end of each year the commission shall apportion the actual cost of the operation of such system which it operates pursuant to the original act among participants upon the basis of the actual water consumed by each municipality, but such amount shall be in no event less than the quantity contracted for. In apportioning such cost, no municipality shall be charged with any item of interest or rental upon, or the cost of operation of, any part of a water supply system which is not used in supplying water to the municipality. Each participant and contracting municipality shall be charged with the amount so apportioned and credited with any amount previously paid on account of the estimated operating expenses for such year.

(c) Notwithstanding any other provision of this act, a commission may apportion to and among participants and contracting municipalities as part of the operating expenses of a project or water supply system in which they have an interest a portion of the commission's general expenses not wholly or directly attributable to the operation or maintenance of any particular project or water supply system. Such allocation shall be fair and equitable taking into account the amounts of direct cost of operating and maintaining, or the volume of water supplied or allocated by or to, particular projects and water supply systems and such other factors as may reasonably be considered for the purpose of such apportionment. Except as provided in this section, a commission shall not use any moneys received by it for use in connection with a particular water supply system or project to pay any costs or expenses incurred by it in connection with any other water supply system or project. [*N. J. S. A.* 58:5-40]

The most important additional power created in the water transmission facilities act was the right of the Commission to finance new projects by issuing bonds. All prior plant and equipment had been paid for by the contracting municipalities, so that the Commission had not incurred any bonded indebtedness.

The Commission's primary function is to obtain and divert water for transmittal to the eight municipalities which in turn distribute that water to their respective inhabitants. Justice Mountain in *North Jersey District Water Supply Commission v. Newark,* 103 *N. J. Super.* 542 (Ch. Div.), aff'd 52 *N. J.* 134 (1968), while sitting in the Chancery Division, summarized the Commission's present status as follows:

> It is, of course, clear that the North Jersey District Water Supply Commission is not a private corporation seeking to make a profit. It is a public body, politic and corporate, exercising public and essential government functions in the interest of the public health and welfare. *N. J. S. A.* 58:5–35. In very general terms, its function is to assist municipalities located within the district to secure and maintain adequate supplies of potable water. *N. J. S. A.* 58:5–1 *et seq.* [103 *N. J. Super.* at 549]

Similarly, in *City of Bayonne v. North Jersey, etc. Commission,* 30 *N. J. Super.* 409 (App. Div. 1954), the Commission was described as being not "a private merchant" but "in a number of respects a public trustee and public curator." *Id.* at 418.

To determine whether the Commission's purchases are for "governmental purposes" and not for use in the "production of goods for commercial sale," as is required for exclusion from GATT, it is appropriate to consider the unique nature of water. The water in our streams that have a natural outlet to the sea is not to be treated or considered in the same manner as private property. Running water of this type historically has been considered common property. *E. Vattel, The Laws of Nations,* Bk. I, ch. 20; 2 *W. Blackstone, Commentaries* 14; *Arnold v. Mundy,* 6 *N. J. L.*

1, 71–78 (Sup. Ct. 1821). Ultimate ownership rests in the people and this precious natural resource is held by the State in trust for the public's benefit. *Bor. of Neptune City v. Bor. of Avon-by-the-Sea,* 61 *N. J.* 296, 305 (1972). This is not to say that a riparian owner may not use the water for purposes related to occupation of the adjoining land. But it is a limited or restricted type of ownership. The riparian owner, at least at common law, had no right to divert the water and merchandise it to others. *See generally,* Hanks, "The Law of Water in New Jersey," 22 *Rutgers L. Rev.* 621, 657–662 (1968).

Justice Pitney in *McCarter v. Hudson County Water Co.,* 70 *N. J. Eq.* 695 (E. & A. 1906), aff'd 209 *U. S.* 349, 28 *S. Ct.* 529, 52 *L. Ed.* 828 (1908), described the principle in the following language:

· It must, we think, be sufficiently obvious that the government established in this state by and for the people thereof has complete dominion (subject only to constitutional limitations) over all things within the borders of the state, including all lands and waters, and the mode of acquiring and disposing of rights of property therein. The fresh-water lakes, ponds, brooks and rivers, and the waters flowing therein, constitute an important part of the natural advantages of this territory, upon the faith of which its population has multiplied in numbers and increased in material and moral welfare. The regulation of the use and disposal of such waters, therefore, if it be within the powers of the state, is among the most important objects of government. [70 *N. J. Eq.* at 701]

This language was echoed by Mr. Justice Holmes in the United States Supreme Court's affirmance:

[I]t appears to us that few public interests are more obvious, indisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use. This public interest is omnipresent wherever there is a state, and grows more pressing as population grows. [209 *U. S.* at 356, 28 *S. Ct.* at 531, 52 *L. Ed.* at 832]

*Cf. Geer v. Connecticut,* 161 *U. S.* 519, 16 *S. Ct.* 600, 40· *L. Ed.* 793 (1896) (transportation of wild game considered common property like water).

As noted above, the Commission had been ordered to construct the water treatment plant so that the water distributed would meet potability standards prescribed by the State Board of Health. In deciding that contracting members must pay their proportionate share of that cost, Justice Handler, then sitting in the Appellate Division, wrote:

> This controversy must be understood in the perspective of the State's overriding concern and obligation to safeguard the public health. *West Caldwell v. Caldwell,* 26 *N. J.* 9, 30 (1958); *Dept. of Health v. Owens-Corning Fiberglas Corp.,* 100 *N. J. Super.* 366, 381 (App. Div. 1968), aff'd 53 *N. J.* 248 (1969). This encompasses a comprehensive power, coupled with a correlative duty, to control and conserve the use of its water resources for the benefit of all its inhabitants. *Trenton v. New Jersey,* 262 *U. S.* 182, 43 *S. Ct.* 534, 67 *L. Ed.* 937 (1923). It is a paramount governmental policy that such water supplies must be pure in quality, and be economically and prudently managed for the benefit of the public. See *Collingswood v. State Water Supply Comm'n,* 85 *N. J. L.* 673, 676 (E. & A. 1914). Designed to protect and promote the general health, safety and welfare, statutes regulating public water resources must be liberally construed to advance and achieve this underlying beneficent policy. *Jersey City v. State Water Policy Comm'n,* 118 *N. J. L.* 72, 76 (E. & A. 1937); *Newark v. N. J. Dept. of Health, supra,* 109 *N. J. Super.* [166] at 177. [127 *N. J. Super.* 251 at 260]

The plaintiffs contend that the diversion and treatment of water by the Commission constitute a proprietary rather than a governmental function. That distinction was recognized at one time to fix tort liability of a governmental body. We cannot and do not accept that rationale in the context of this litigation. What we said in *Washington Tp. v. Ridgewood Village,* 26 *N. J.* 578 (1958), when we rejected the same contention in interpretation of a zoning ordinance, is equally applicable here:

> [W]e cannot agree that the distinction between governmental and proprietary functions is relevant to this controversy. The distinction is illusory; whatever local government is authorized to do consti-

tutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur. The distinction has proved useful to restrain the ancient concept of municipal tort immunity, not because of any logic in the distinction, but rather because sound policy dictated that governmental immunity should not envelop the many activities which government today pursues to meet the needs of the citizens. [*Id.* at 584]

Furthermore, this distinction, once useful in the field of municipal tort immunity, has been discarded even for that purpose. *B. W. King, Inc. v. West New York,* 49 *N. J.* 318, 324–326 (1967); *N. J. S. A.* 59:1–1 *et seq.* (N. J. Tort Claims Act).

We are satisfied that the Commission's activities in harnessing, treating and channeling the water to eight municipalities constitute appropriate governmental functions and purposes. It is transmitting "common" property, potable water, to municipalities for the use of their inhabitants — a necessity upon which their very existence depends. In performing these functions, the Commission, unlike a commercial enterprise, operates at cost. We find, then, that the Commission's purchases of materials and equipment for its water treatment plant are for governmental purposes and not with a view to use in the "production of goods for commercial sale."

Furnishing water might be considered as a sale of a "service", as distinguished from the sale of "goods", on the theory that water is a naturally produced item which is simply being distributed. For example, the Arizona Corporation Commission in the matter of the *Acme Water Company,* 24 *P. U. R.* (N. S.) 64 (1937), stated:

A [water] public utility is selling a service. Water is God's gift to man. It is free. The utility is selling a service for the distribution of water and not water as a commodity.

So, too, we refused to consider water as a "product" in *In re Glen Rock,* 25 *N. J.* 241, 247 (1957), overruled on other

grounds, *City of North Wildwood v. Bd. of Comm'rs of Wild-wood,* 71 *N. J.* 354 (1976) and in *In re West New York,* 25 *N. J.* 377, 384–386 (1957). On the other hand, an agreement between two municipalities for the sale and purchase of water has been held to involve a transfer of goods so that the statute of frauds applied to the transaction. *Jersey City v. Harrison,* 72 *N. J. L.* 185, 188–189 (E. & A. 1905). Moreover, the warranty provisions of the Uniform Sales Act, a statute restricted to the sale of goods, have been found to apply to the furnishing of water. *Canavan v. Mechanicville,* 229 *N. Y.* 473, 128 *N. E.* 882 (Ct. App. 1920). We find it unnecessary to resolve this problem (services or goods) since if it is a service GATT would not apply, and even if the collection and treatment of water be deemed to be "the production of goods" it is clear, as stated above, that these Commission operations are not for the purposes of effecting "commercial" sales. We hold that purchases for the construction of this water treatment plant are exempted from the operation of Article III of GATT and accordingly GATT has not preempted State jurisdiction.

## II

### THE NEW JERSEY BUY AMERICAN STATUTE AND THE FEDERAL FOREIGN AFFAIRS POWER

■ Plaintiffs argue that the New Jersey Buy American provisions, *N. J. S. A.* 52:33–2 and 3, even if found not to conflict with GATT, represent an impermissible intrusion by the State into the field of foreign affairs, an area constitutionally reserved to Congress and the President. The Constitution contains no specific grant to Congress to enact legislation to regulate foreign affairs, but existence of such power stemming from national sovereignty has been acknowledged by the Supreme Court. *Perez v. Brownell,* 356 *U. S.* 44, 57, 78 *S. Ct.* 568, 575, 2 *L. Ed.* 2d 603, 613 (1958); *United States v. Curtiss-Wright Export Corp.,* 299 *U. S.* 304, 318, 57 *S. Ct.* 216, 220, 81 *L. Ed.* 255, 261–262

(1936). Although the extent of the national foreign affairs power residing in the executive and legislative branches has been the subject of considerable controversy, *see, e. g.*, Henkin, "The Treaty Makers and the Law Makers: The Law of the Land and Foreign Relations," 107 *U. Pa. L. Rev.* 903 (1959), it is generally agreed that the constitution imposes severe limitations on state participation in foreign affairs. *See, e. g.*, Lofgren, *"United States v. Curliss-Wright Export Corporation:* An Historical Reassessment," 83 *Yale L. J.* 1, 3 (1973).

Plaintiffs rely primarily upon the Supreme Court opinion in *Zschernig v. Miller,* 389 *U. S.* 429, 88 *S. Ct.* 664, 19 *L. Ed.* 2d 683 (1968), reh. den. 390 *U. S.* 974, 88 *S. Ct.* 1018, 19 *L. Ed.* 2d 1196 (1968), for their position that the Buy American provisions constitute an impermissible state invasion of foreign policy. *Zschernig* involved an Oregon probate law which conditioned the right of a nonresident alien to inherit from Oregon residents upon the alien's ability to demonstrate that his country of origin would grant reciprocal rights to U. S. citizens and would not confiscate personalty passing to the alien claimant. The Supreme Court found that the statute as applied represented an unconstitutional intrusion upon the foreign affairs power. Mr. Justice Douglas, writing for the majority, observed that under similar provisions courts of other states had conducted minute inquiries into the ideological climates of various foreign countries, often disfavoring claimants from Marxist nations. 389 *U. S.* at 435, 88 *S. Ct.* at 667, 19 *L. Ed.* 2d at 689. He further noted that the real desiderata of the Oregon decisions under the statute seemed to be "foreign policy attitudes, the freezing or thawing of the 'cold war' and the like * * *." 389 *U. S.* at 437, 88 *S. Ct.* at 669, 19 *L. Ed.* 2d at 690. In a concurring opinion, Mr. Justice Stewart (joined by Mr. Justice Brennan) stated that "any realistic attempt to apply [the criteria of the statute] would necessarily involve the Oregon courts in an evaluation, either express or implied, of the administration of foreign law, the credibility of

foreign diplomatic statements, and the policies of foreign governments." 389 *U. S.* at 442, 88 *S. Ct.* at 671, 19 *L. Ed.* 2d at 693.

It is significant that the Supreme Court in *Zschernig* refused to reexamine its ruling in *Clark v. Allen,* 331 *U. S.* 503, 67 *S. Ct.* 1431, 91 *L. Ed.* 1633 (1947). In *Clark,* a California statute permitted a nonresident alien to inherit personalty only if there was a reciprocal right on the part of United States' citizens to take on the same terms and conditions as citizens of the other nation. The challenge to the statute grounded on its intrusion into the field of foreign affairs was rejected. In *Zschernig* Mr. Justice Douglas, who had also written the opinion in *Clark,* pointed out that the California reciprocity statute "did not on its face intrude in the federal domain" and would only have "some incidental or indirect effect in foreign countries," 389 *U. S.* at 433–438, 88 *S. Ct.* at 667, 19 *L. Ed.* 2d at 688. *See also In re Estate of Kish,* 52 *N. J.* 454, 466 (1968), where Justice Hall upheld the validity of the New Jersey custodial statute, *N. J. S. A.* 3A:25–10. He construed the statute to prohibit payments to foreign beneficiaries when it was apparent from a routine reading of the foreign country's laws that the beneficiary's receipt was forbidden.

It is quite clear that the New Jersey Legislature, by means of the statutory provisions under review, has not authorized its local units of government to engage in the sensitive business of evaluating the politics of countries whose citizens seek to market their products in this State. The Buy American provisions apply without any discrimination based on the ideology of the seller's country. Nor is there any evidence to suggest that the political climate in a potential foreign bidder's nation has ever motivated the inclusion of the Buy American condition in an invitation for bids or that its inclusion is predicated on an assessment of the internal policies of any foreign country. If refined inquiries into foreign ideologies entered into the decision to apply or not to apply the condition, there would, of course, be little difficulty in

finding a constitutional infirmity of the type condemned in *Zschernig*. But the statute in no way requires, nor should it be construed to permit, such inquiries. We can only conclude the statute does not represent the kind of intrusion into the foreign affairs power condemned in *Zschernig*.[6] *See* Berliner, "State 'Buy American' Policies — One Vice, Many Voices," 32 *Geo. Wash. L. Rev.* 584, 594–598 (1964). For a comparable interpretation of *Zschernig,* see Note, 6 *Texas Int'l L. F.* (1970).

In addition to *Zschernig,* the plaintiffs rely heavily on *Bethlehem Steel Corp. v. Board of Comm'rs of Dept. of W. & P.,* 276 *Cal. App.* 2d 221, 80 *Cal. Rptr.* 800 (Ct. App. 1969). The California court in a 3 to 1 decision declared unconstitutional the California Buy American Act containing an absolute requirement that only materials manufactured in the United States be used. The court likened the California act to the Oregon statute in *Zschernig* and reasoned that the states have no power to affect foreign commerce, an exclusive federal domain. Referring to the numerous treaties and agreements concerned with trade which the United States has entered into with foreign nations, including GATT (noting that it was unnecessary to delve into an analysis of that agreement), the court held that the California statute had more than an incidental or indirect effect on foreign affairs.[7]

■ The California Buy American Act did not have the restricted sphere and more limited impact of the New Jersey statute. *Compare N. J. S. A.* 52:33–2 and 3 *with Cal. Gov't*

---

[6]Moreover, the Buy American provisions seem to be consistent with federal policy. See the federal Buy American Act, 41 *U. S. C. A.* § 10a *et seq.* (1965) (original version at 47 *Stat.* 1520 (1933)). The act has been implemented by Exec. Order No. 10,582, 19 *F. R.* 8723 (1954), as amended by Exec. Order No. 11,051, 27 *F. R.* 9683 (1962), reprinted in 41 *U. S. C. A.* § 10d (1965).

[7]For a critical analysis of Bethlehem Steel, see Note, 3 *N. Y. J. Int'l L. & Pol.* 164 (1970).

*Code* §§ 4300–4305 ,(West 1966). Unlike the California Code *N. J. S. A.* 52:33–2 and 3 provide that domestic materials need not be used if the cost is "unreasonable" or it is "inconsistent with the public interest" or it is "impracticable." Nor did the California court consider the express exemption in GATT into which the New Jersey legislation fits. This exemption indicates that the federal government has not foreclosed state action which does not have a significant and direct impact on foreign affairs. Indeed, it would appear that federal policy reflected by the GATT exemption would tolerate state action which is not inconsistent with the overriding federal approach to foreign trade. Moreover, we do not agree that every and any state statute which in any way touches upon foreign affairs is proscribed. States may properly exercise their police powers and in doing so have some permissible effect on foreign trade. *Cf. DeCanas v. Bica,* 424 *U. S.* 351, 96 *S. Ct.* 933, 47 *L. Ed.* 2d 43 (1976) (upholding a California statute regulating alien employment even though it touches upon the exclusive federal power to regulate immigration). We read *Zschernig* and *Clark* to permit state regulation which does not result demonstrably in a significant and direct impact upon foreign affairs.

## III

## THE NEW JERSEY BUY AMERICAN STATUTE AND THE COMMERCE CLAUSE

The United States Constitution empowers Congress "[t]o regulate Commerce with foreign Nations and among the several States * * *." *U. S. Const.,* Art. I, § 8, cl. 3. Although literally the clause authorizes only Congress to act, it is well settled that, at least in the absence of a finding that Congress has preempted the field, there exists a residuum of power in the states to enact legislation affecting commerce. *Cooley v. Board of Wardens,* 53 *U. S.* (12 *How.*) 299, 13 *L. Ed.* 996 (1852) ; *Southern Pacific Co. v. Arizona,* 325 *U. S.* 761, 65 *S. Ct.* 1515, 89 *L. Ed.* 1915 (1945) ; *Pike v. Bruce*

*Church, Inc.*, 397 *U. S.* 137, 90 *S. Ct.* 844, 25 *L. Ed.* 2d 174 (1970). Since we have found that GATT is inapplicable to the governmental purchases for construction of the water treatment plant and that no other treaty or federal legislation preempts the subject matter, our inquiry must be addressed to whether the Commerce Clause prevents New Jersey from favoring domestic materials in its public works purchases and contracts.

■■ The underlying concept of the Commerce Clause is the regulation of commerce. *Gibbons v. Ogden*, 22 *U. S.* (9 *Wheat.*) 1, 6 *L. Ed.* 23 (1824). Constitutionally commerce has been interpreted to cover every type of movement of persons and things, tangible and intangible. *E. g., United States v. South-Eastern Underwriters Ass'n*, 322 *U. S.* 533, 64 *S. Ct.* 1162, 88 *L. Ed.* 1440 (1944). Controversies involving the implicit proscription against state interference have centered about state attempts to establish, directly or indirectly, economic barriers to forestall free trade among the states and prevent foreign competition. *H. P. Hood & Sons v. DuMond*, 336 *U. S.* 525, 69 *S. Ct.* 657, 93 *L. Ed.* 865 (1949). United States Supreme Court cases explicating the unexercised commerce power have traditionally involved state regulation of activity in the private sector. *See, e. g., id.; Hale v. Bimco Trading, Inc.*, 306 *U. S.* 375, 59 *S. Ct.* 526, 83 *L. Ed.* 771 (1939) ; *Baldwin v. G. A. F. Seelig, Inc.*, 294 *U. S.* 511, 55 *S. Ct.* 497, 79 *L. Ed.* 1032 (1934). Review of such state legislation calls for a balancing of the local public interest against the extent of the burden, and consideration of the availability of less onerous alternatives. *Pike v. Bruce Church, Inc., supra; A. & P. Tea Co. v. Cottrell;* 424 *U. S.* 366, 96 *S. Ct.* 923, 47 *L. Ed.* 2d 55 (1976).

It was not until *Hughes v. Alexandria Scrap Corp.*, 426 *U. S.* 794, 96 *S. Ct.* 2488, 49 *L. Ed.* 2d 220 (1976), that the Supreme Court discussed the legal impact of the state's entry into the marketplace as a purchaser of goods, rather

than as a regulator of the commercial activities of others.[8] In that case the State of Maryland instituted a program to encourage elimination of abandoned automobiles by paying a subsidy to licensed processors to destroy such vehicles. However, because of an amendment to the Maryland statute nonresident processors had to meet substantially more onerous requirements with respect to the title of the vehicles so that Maryland processors were given a substantial advantage in obtaining the business. An out-of-state processor challenged the amendment as violative of the Commerce Clause. Mr. Justice Powell, writing for the majority, reasoned that commerce created when the state enters the market on its own behalf is not to be equated with a state's interference with the natural functioning of the interstate market "through burdensome regulation." *Id.* at 805–806, 96 *S. Ct.* at 2495–2496, 49 *L. Ed.* 2d at 228–229. He stated that:

[U]ntil today the Court has not been asked to hold that the entry by the State itself into the market as a purchaser, in effect, of a potential article of interstate commerce creates a burden upon that commerce if the State restricts its trade to its own citizens or businesses within the State. [*Id.* at 808; 96 *S. Ct.* at 2497, 49 *L. Ed.* 2d at 231]

Mr. Justice Powell concluded:[9]

---

[8]For a brief analysis of *Alexandria Scrap*, see "The Supreme Court, 1975 Term," 90 *Harv. L. Rev.* 55, 58–63 (1976).

[9]In a footnote to the opinion Mr. Justice Powell observed:
Our reference to the absence of congressional action implies no view on whether Congress could prohibit the type of selective participation in the market undertaken by Maryland. It is intended only to emphasize that this case involves solely the restrictions upon state power imposed by the Commerce Clause when Congress is silent. [*Id.* n. 19]
Whether Congress has the authority to prohibit states from preferring domestic products in their governmental purchases is an issue which is not before us. See *National League of Cities v. Usery*, 426 *U. S.* 833, 96 *S. Ct.* 2465, 49 *L. Ed.* 2d 245 (1976), in which the extension of the Fair Labor Standards Act to employees of states and their political subdivision was held to be beyond con-

Nothing in the purposes animating the Commerce Clause forbids a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others. [*Id.* at 810; 96 *S. Ct.* at 2497; 49 *L. Ed.* 2d at 231]

Accordingly, he held that the amendment was constitutional. Mr. Justice Stevens in his concurring opinion emphasized the same point by stating that:

It is important to differentiate between commerce which flourishes in a free market and commerce which owes its existence to a state subsidy program. Our cases finding that a state regulation constitutes an impermissible burden on interstate commerce all dealt with restrictions that adversely affected the operation of a free market. This case is unique because the commerce which Maryland has "burdened" is commerce which would not exist in Maryland had not decided to subsidize a portion of the automobile scrap-processing business. [*Id.* at 815, 96 *S. Ct.* at 2500, 49 *L. Ed.* 2d at 234]

An earlier example of the analysis followed in *Alexandria Scrap* is found in *American Yearbook Company v. Askew,* 339 *F. Supp.* 719 (M. D. Fla. 1972)[10] There a three-judge

gressional power under the Commerce Clause. Even if the GATT agreement be considered the equivalent of Congressional action, we are concerned with those materials purchased by state governmental agencies which are exempt from the GATT requirements.

[10]The concept that the states are free to fix the terms and conditions of public employment, public contracting and public purchases also finds expression in several cases decided under the Fourteenth Amendment. *See Atkin v. Kansas,* 191 *U. S.* 207, 24 *S. Ct.* 124, 48 *L. Ed.* 148 (1903) (upholding state criminal statute requiring public works contractors to comply with maximum hours law) ; *Heim v. McCall,* 239 *U. S.* 175, 36 *S. Ct.* 78, 60 *L. Ed.* 206 (1915) (upholding state statute confining employment on public works to citizens of the United States and giving preference to New York citizens). In *Perkins v. Lukens Steel Co.,* 310 *U. S.* 113, 60 *S. Ct.* 869, 84 *L. Ed.* 1108 (1940), a case holding a bidder on a federal contract did not have standing to challenge an agency determination that federal minimum wage regulations were applicable to the project, this principle was reaffirmed in the following dictum :

Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions

District Court upheld the constitutionality of a Florida statute which required that all the state's public printing be produced in Florida. Involved was the printing of yearbooks for a state-owned university. The court held simply that "trade regulations are clearly subject to Commerce Clause restrictions, but statutes that merely specify the conditions of state purchases are not." *Id.* at 725. The Supreme Court summarily affirmed. 409 *U. S.* 904, 93 *S. Ct.* 230, 34 *L. Ed.* 2d 168 (1972). Summary affirmances are binding precedents, *Hicks v. Miranda,* 422 *U. S.* 332, 343–345, 95 *S. Ct.* 2281, 45 *L. Ed.* 2d 223, 235–236 (1975), on the "precise issues presented and necessarily decided by those actions." *Mandel v. Bradley,* 432 *U. S.* 173, 97 *S. Ct.* 2238, 53 *L. Ed.* 2d 199, 205 (1977). *American Yearbook* at least stands for the proposition that facially restrictive state purchasing statutes are permissible under the Commerce Clause where the state is purchasing items of commerce for its own end use.[11]

---

upon which it will make needed purchases. Acting through its agents as it must of necessity, the Government may for the purpose of keeping its own house in order lay down guideposts by which its agents are to proceed in the procurement of supplies, and which create duties to the Government alone. [*Id.* at 127, 60 *S. Ct.* at 876, 84 *L. Ed.* at 1114 (footnote omitted)]

Developments in Fourteenth Amendment doctrine indicate that states may not disfavor resident aliens in public employment, *see, e. g., Sugarman v. Dougall,* 413 *U. S.* 634, 93 *S. Ct.* 2842, 37 *L. Ed.* 2d 853 (1973) (state statute prohibiting employment of aliens in the competitive classified civil service violates federal Equal Protection Clause) ; *C. D. R. Enterprises Ltd. v. Board of Educ. of N. Y.,* 412 *F. Supp.* 1164 (E. D. N. Y. 1976), aff'd *mem sub nom. Lefkowitz v. C. D. R. Enterprises Ltd.,* 429 *U. S.* 1031, 97 *S. Ct.* 721, 52 *L. Ed.* 2d 742 (1977) (state labor law preferring United States citizens in public works construction violates Equal Protection Clause). These developments, however, would not seem to disturb the conclusion we reach that this case, in which no Fourteenth Amendment claim has been raised, is controlled by the principles enunciated in *Alexandria Scrap* and *American Yearbook.*

[11]Mr. Justice Brennan in his dissenting opinion in *Alexandria Scrap* suggested that *American Yearbook* applies only when the state acted in a proprietary capacity. 426 *U. S.* at 824, 96 *S. Ct.* at 2504, 49 *L. Ed.* 2d at 240. However, the majority opinion did not

██ One principle to be derived from *Alexandria Scrap* and *American Yearbook* is that a state's legislation with respect to its purchase of goods and materials for its own end use, at least in the absence of federal action, is not subject to the usual Commerce Clause restrictions. The state legislation which is so sanctioned would seem to include those acts designed to further economic interests or other legitimate ends, such as public health and welfare.

An objection to the application of this principle to the facts of this case might be advanced on the theory that a state's decision to favor American as opposed to in-state producers does not reflect a legitimate "local" purpose. In this manner, a Buy New Jersey scheme would be exempt from Commerce Clause restrictions, but a Buy American scheme would not. We cannot accept this incongruous result. When the state chooses to favor its own residents it is by definition disfavoring foreign, as well as out-of-state, producers. It would be odd indeed to find that when a state becomes less parochial and chooses in its own purchases to prefer the products of the nation, as opposed to those of the state, its purpose becomes suspect under the Commerce Clause. To the extent that *American Yearbook* and *Alexandria Scrap* tolerate economic protectionism in the limited context of governmental purchasing, contracting and subsidy programs, they merely acknowledge that when traditional Commerce Clause considerations do not obtain a state's concern with the economic welfare of its inhabitants is viewed as a perfectly legitimate object of the police power. When that concern extends to the economic welfare of the nation, which under established Commerce Clause analysis the states are en-

---

recognize this limitation. Functionally, the effect on commerce is the same irrespective of the capacity in which the state acts. The Florida statute, on its face, applied to all public printing irrespective of the state's. capacity. *Cf. New York v. United States*, 326 U. S. 572, 583, 66 S. Ct. 310, 314, 90 L. Ed. 326, 334 (1945) (proprietary-governmental distinction rejected as untenable criterion for deciding whether a state activity is immune from federal taxation).

couraged to view as central to their own, we see no reason to deem it less legitimate.

Plaintiffs have placed substantial reliance upon our decision in *Garden State Dairies of Vineland, Inc. v. Sills,* 46 *N. J.* 349 (1966). At issue was the constitutionality of a statute which required that governmental purchasers of milk obtain from the seller a certification that he would purchase an equal amount of fresh milk produced in New Jersey. We referred to the right of a private purchaser to prefer local merchants and asked whether "the State as a purchaser [may] exercise a similar power in the purchase of milk for itself[.]" *Id.* at 353. In view of the then existing federal decisions, *compare Polar Ice Cream & C. Co. v. Andrews,* 375 *U. S.* 361, 84 *S. Ct.* 378, 11 *L. Ed.* 2d 389 (1964) (invalidating a statute favoring local milk producers, but not involving state purchases) *with Heim v. McCall,* 239 *U. S.* 175, 36 *S. Ct.* 78, 60 *L. Ed.* 206 (1915) (sustaining state statute requiring that only United States citizens be employed on public works construction and giving preference to New York citizens), we were not prepared to find the preferential scheme invalid *per se,* but held that the statutory restrictions in favor of local interests would be invalid if they created an undue burden on interstate commerce. The cause was remanded to permit the parties to produce evidence so that a record could be made on the extent of the burden. The approach of *Garden State Dairies* is no longer viable in the light of *Alexandria Scrap.*[12]

That this case involves foreign commerce, and not interstate commerce, does not disturb our analysis. Generally speaking, and recognizing as we do the federal constitutional authority of the Executive in the field of foreign affairs, the

---

[12]The District Court in *American Yearbook* rejected *Garden State Dairies,* 339 *F. Supp.* at 725, and, although Mr. Justice Brennan cited it approvingly in his dissent in *Alexandria Scrap,* 426 *U. S.* at 823, 96 *S. Ct.* at 2504, 49 *L. Ed.* 2d at 241, the majority did not consider it persuasive.

extent of Congressional power to act with respect to foreign commerce is similar to its authority to enact legislation regulating interstate commerce. Chief Justice Taney in the *License Cases*, 46 *U. S.* (5 *How.*) 504, 12 *L. Ed.* 256 (1847) commented:

The power to regulate commerce among the several states is granted to Congress in the same clause, and by the same words, as the power to regulate commerce with foreign nations, and is coextensive with it. [*Id.* at 578, 12 *L. Ed.* at 289]

*See also Pittsburgh & Southern Coal Co. v. Bates*, 156 *U. S.* 577, 587, 15 *S. Ct.* 415, 418, 39 *L. Ed.* 538, 544 (1895). For a contrary view, see dissenting opinion in the *Lottery Case*, 188 *U. S.* 321, 373-374, 23 *S. Ct.* 321, 333-334, 47 *L. Ed.* 492, 507-508 (1903). Further, the cases scrutinizing state regulations affecting commerce, in the absence of interference with the foreign affairs power, seem to have made no distinction between interstate and foreign commerce. *E. g., Brown v. Maryland*, 25 *U. S.* (12 *Wheat.*) 419, 6 *L. Ed.* 678 (1827) ; *Hale v. Bimco Trading, Inc.*, 306 *U. S.* 375, 59 *S. Ct.* 526, 83 *L. Ed.* 771 (1939). Of course, some differences between interstate and foreign commerce exist. However, we see no need in this factual context to differentiate between the two.

We have previously concluded that the State was properly executing an appropriate governmental purpose by authorizing a state agency to construct a water treatment plant as part of its operations in collecting and diverting water to municipalities for the use of their inhabitants. Under the principle of *Alexandria Scrap,* the state agency's limitations with respect to purchases of materials and equipment for that plant, to be owned and operated as a government institution, do not offend the Commerce Clause. The New Jersey Buy American provisions are not measures regulating private business. Moreover, the Buy American statute, as we have previously noted, is not framed as an absolute. If the United States materials are not of satisfactory quality,

or the cost would be unreasonably increased or it would be impractical to impose the Buy American requirement, foreign goods may be utilized. We cannot be unmindful that under GATT the New Jersey statute can apply only to items purchased by government agencies for governmental purposes which are not to be used in the production of goods for commercial sale.

Congress has expressed a policy judgment that foreign commerce will not be unduly burdened when the federal government and its agencies prefer domestic products in their purchases.[13] By enacting the Buy American Act, Congress has

---

[13]The federal Buy American Act, 41 *U. S. C.* § 10a *et seq.*, provides:

41 *U. S. C.* § 10a. *American materials required for public use*

Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use * * *.

41 *U. S. C.* § 10b. *Contracts for public works; specification for use of American materials; blacklisting contractors violating requirements*

(a) Every contract for the construction, alteration, or repair of any public building or public work in the United States growing out of an appropriation heretofore made or hereafter· to be made shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers, shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States except as provided in section 10a of this title: *Provided, however*, That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted

approved the policy of preferring domestic goods for federal governmental projects. State statutes patterned after the federal act are consonant with that policy. At least when governmental purchases are not to be used in the production of goods for commercial sale, that policy judgment has been impliedly extended to the states through the express exemption in GATT. Although Buy American statutes have been the subject of extensive criticism, *see, e.g.,* Knapp, "The Buy-American Act: A Review and Assessment," 61 *Colum. L. Rev.* 430 (1960); Berliner, "State Buy American Policies— One Vice, Many Voices," 32 *Geo. Wash. L. Rec.* 584 (1964); it is our function to review the constitutionality, not the wisdom, of statutes. We conclude that *N. J. S. A.* 52:33-2 and 3 do not violate the Commerce Clause.

## CONCLUSION

In summary we are satisfied:

(1) That the North Jersey District Water Supply Commission, a governmental agency, is acting in furtherance of governmental purposes in harnessing, diverting and distributing water, a common property belonging to the public, to the people through their respective municipalities; that the Commission operates at cost; that, even if water be deemed a product, the production of potable water in the proposed water treatment plant is not "for commercial sale"; and that the Buy American statute governing the Commission's purchases of goods, materials and equipment for the proposed water treatment is excluded from GATT;

---

in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception.

The New Jersey statute under review, *L.* 1934, *c.* 90, was enacted shortly after the federal act. Its language is substantially similar to that of the federal act.

(2) That the New Jersey Buy American provisions, *N. J. S. A.* 52:33-2 and 3, do not impermissibly interfere with the federal government's conduct of foreign affairs; and

(3) That those provisions do not constitute proscribed state action under the Commerce Clause, at least in the absence of federal legislation.

We have heretofore entered an order reversing the Appellate Division's judgment and directing that the Commission use the bids based on the specifications which included the Buy American provisions.

HANDLER, J., concurring in the result.

*For reversal* — Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—5.

*For affirmance*—None.