JOHNS–MANVILLE SALES CORPORATION, PLAINTIFF-APPEL-
LANT, v. NEW JERSEY WATER SUPPLY AUTHORITY AND
STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 13, 1986—Decided June 5, 1986.

Before Judges GAULKIN, DEIGHAN and STERN.

*George W. Fisher* argued the cause for appellant (*Mason, Griffin & Pierson,* attorneys).

*George P. Cook,* Deputy Attorney General, argued the cause for respondents (*W. Cary Edwards,* Attorney General, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

GAULKIN, J.A.D.

Johns-Manville Sales Corporation (Manville) challenges as "ultra vires and without force or effect" a regulation of the New Jersey Water Supply Authority (Authority) imposing water use charges. Alternatively, Manville contends that the regulation is unconstitutional as applied "since it authorizes and accomplishes a taking of [Manville's] property for public purpose without just compensation."

Manville owns a large tract along the Raritan River, on which it conducts a manufacturing business. It has been diverting waters from the river for its commercial operations since approximately 1912. Manville presently draws the water at a point approximately 1800 feet above the United States Geological Survey, Manville Gaging Station, returns approximately 53% to the river just above the Gaging Station and returns the remaining 47% at a point approximately 6000 feet downstream of the Gaging Station. It is undisputed that the water returned to the river is substantially undiminished in quantity and not substantially degraded in quality. Manville draws from the river, through high speed pumps, up to 13,000 gallons per minute, 6,500,000 gallons per day.[1]

The Authority has imposed charges for Manville's diversion of the waters pursuant to *N.J.A.C.* 7:11–2.12:

> Where the water withdrawn within the Raritan River Basin, as supported by releases from Spruce Run and Round Valley Reservoirs, is returned to the stream channel at a point reasonably considered to be in the near vicinity of the point of withdrawal, substantially undiminished in quantity, and not substantially degraded in quality, all as determined by the New Jersey Water Supply Authority, the purchaser shall only pay at the rate specified under the General Rate Schedule as set forth at *N.J.A.C.* 7:11–2.2, as applied to the daily allotment. The annual Demand Charge for such use shall be determined by multiplying the daily allotment charge by 365.[2]

That regulation was initially adopted in 1979 pursuant to the New Jersey Water Supply Law, *N.J.S.A.* 58:22–1 *et seq.*, and was continued in effect upon the 1981 adoption of the Water Supply Management Act, *N.J.S.A.* 58:1A–1 *et seq.*, and the New Jersey Water Supply Authority Act, *N.J.S.A.* 58:1B–1 *et seq.* *See N.J.S.A.* 52:14D–6; *N.J.S.A.* 58:1B–25.

---

[1]Manville's present non-depletive water use is authorized by a 1983 permit issued by the Department of Environmental Protection and a 1984 contract between Manville and the Authority. The contract reserved to Manville the right "to bring litigation as to charges for water diverted."

[2]*N.J.A.C.* 7:11–2.12 recodifies, in substantially similar language, the regulation previously designated as *N.J.A.C.* 7:11–2.11.

■■ Manville's principal contention is that none of those statutes allows the Authority to charge a riparian owner for the exercise of its common law right to divert water from its natural flow. We find no merit in that contention. Manville does not own the water flowing by its property. That water is publicly owned. As Justice Schreiber stated in *K.S.B. Tech. Sales v. No. Jersey Dist. Water Supply*, 75 *N.J.* 272, 285–86 (1977), appeal dism. 435 *U.S.* 982, 98 *S.Ct.* 1635, 56 *L.Ed.*2d 76 (1978):

> The water in our streams that have a natural outlet to the sea is not to be treated or considered in the same manner as private property. Running water of this type historically has been considered common property. E. Vattel, *The Laws of Nations*, Bk. I, ch. 20; 2 *W. Blackstone, Commentaries* 14; *Arnold v. Mundy*, 6 *N.J.L.* 1, 71–78 (Sup.Ct.1821). Ultimate ownership rests in the people and this precious natural resource is held by the State in trust for the public's benefit. *Bor. of Neptune City v. Bor. of Avon-by-the-Sea*, 61 *N.J.* 296, 305 (1972). This is not to say that a riparian owner may not use the water for purposes related to occupation of the adjoining land. But it is a limited or restricted type of ownership.

The riparian owner is limited to a "reasonable use" of the waters of a stream or water course abutting his property; what constitutes reasonable use is "a question of fact to be determined in each case upon a consideration of all the relevant circumstances." *Armstrong v. Francis Corp.*, 20 *N.J.* 320, 330 (1956). Thus the fact that Manville drew a certain volume of water from the river at one point in time does not confer on it any "right" to continue to do so.

■ The New Jersey Water Supply Law, *N.J.S.A.* 58:22–1 *et seq.*, under which *N.J.A.C.* 7:11–2.11 was originally promulgated, was enacted in 1958 for the purpose, among others, of developing the Raritan River Basin as a source of water supply. *N.J.S.A.* 58:22–2(b) and (c). Two resevoirs, Spruce Run and Round Valley, were constructed pursuant to the concurrently enacted Water Supply Bond Act, *L.*1958, *c.* 35, to provide additional water in the Raritan River Basin and to assure that legislatively fixed minimum flow rates would be maintained. *N.J.S.A.* 58:22–2(g) and *N.J.S.A.* 58:22–8. In connection with this publicly funded expansion of the water supply, the legisla-

ture granted to the then Department of Conservation and Economic Development "jurisdiction and control ... over the use and disposition of all additional water made available for use pursuant to this act" and authorized the Department to "sell such water and rights thereto on just and reasonable terms and conditions as determined by the [Water Policy and Supply Council] and at just, reasonable and equitable rates and charges." *N.J.S.A.* 58:22–9(a).

In 1981 the legislature adopted the Water Supply Management Act, *N.J.S.A.* 58:1A–1 *et seq.*, upon its finding that water resources "are public assets of the State held in trust for its citizens," that those resources "must be planned for and managed as a common resource," that it is necessary "to insure that within each basin there exists adequate water supplies to accommodate present and future needs" and that the State accordingly must "have the power to manage the water supply by adopting a uniform water diversion permit system and fee schedule." *N.J.S.A.* 58:1A–2. The Commissioner of the Department of Environmental Protection was authorized to promulgate rules and regulations "to control, conserve and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate supply of water under a variety of conditions." *N.J.S.A.* 58:1A–5. The legislature concurrently adopted the New Jersey Water Supply Authority Act, *N.J.S.A.* 58:1B–1 *et seq.*, which created the New Jersey Water Supply Authority (*N.J.S.A.* 58:1B–4a), to which all water supply facilities owned or operated by the State, including specifically the Spruce Run—Round Valley Reservoir Complex, were transferred. *N.J.S.A.* 58:1B–5a. The Authority was specifically granted authority to fix and collect charges for water and services provided by it. *N.J.S.A.* 58:1B–7g; *N.J.S.A.* 58:1B–19.

Viewed both separately and together, the successive enactments thus make abundantly clear that from and after 1958 the State has undertaken, at substantial public expense, to protect, enhance and husband the water resources of the Raritan River

Basin as well as other water resources. That assumption of authority is wholly consistent with the State's obligation to hold "this precious natural resource ... in trust for the public's benefit." *K.S.B. Tech. Sales,* 75 *N.J.* at 286. In aid of that undertaking, the State, through its legislatively designated agencies, has been authorized at all times since 1958 to fix charges for water resources and services. We thus have no difficulty in concluding that the imposition of charges for non-depletive use of water as provided in *N.J.A.C.* 7:11–2.12 is entirely consistent with all of the statutes in effect since 1958.

In support of its contrary reading of the statutes, Manville relies in significant part on the language of *N.J.S.A.* 58:22–9(a) which establishes State jurisdiction over the use and disposition of "all additional water" made available pursuant to the New Jersey Water Supply Law and the language of *N.J.S.A.* 58:22–11 which directs that the Law shall not be construed "to diminish or impair the common law rights of riparian owners." Those provisions do not have the import Manville suggests. The grant to the State of authority over "additional water" cannot reasonably be construed as the grant to Manville of an unrestricted right to continue its prior diversions. Manville had, and has, a common law right only of "reasonable use." The legislature, acting to protect the supervening rights and interests of the public at large, has granted to public agencies the task of regulating and allocating water resources; the administrative regulation fixing charges for non-depletive diversions thus represents a public determination, not an abrogation, of the rights of Manville and other riparian owners.

For substantially the same reasons, we also find without merit Manville's alternative contention that the effect of *N.J. A.C.* 7:11–2.12 is to take its private property without just compensation. The water resources are publicly owned and subject to State regulation; the State's action in allocating those resources does not invade any constitutionally protected

interests of Manville. *Cf. Reingold v. Harper*, 6 *N.J.* 182, 193–95 (1951).

We thus sustain *N.J.A.C.* 7:11–2.11 against the challenges raised by Manville.